IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| CHESTER D. WATT,<br><br>    Petitioner,<br><br>v.<br><br>KEISHA A. WHITE,<br><br>    Respondent. | Civil Action No.   25-cv-00181 |

**VERIFIED COMPLAINT AND PETITION FOR RETURN OF CHILD**

COMES NOW Petitioner Chester D. Watt ("Mr. Watt" or "Petitioner"), by and through his undersigned counsel, and submits this, his Verified Complaint and Petition for Return of Child ("Complaint") against Respondent Keisha A. White ("Ms. White" or "Respondent"), respectfully showing the Court as follows:

### I.     INTRODUCTION

1. Mr. Watt brings this action under the United Nations Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 19 I.L.M. 1501, (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA"). The Hague Convention came into effect in the United States on July 1, 1988, and has been ratified between the United States, Jamacia, and over 80 other Contracting States.

2. The Hague Convention and ICARA have two overarching purposes: to (a) "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (b) "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other contracting States." Hague Convention, art. 1(a)–(b).

3. The Hague Convention and ICARA provide a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention. *See id.*, art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.").

4. One goal of the Hague Convention and ICARA is to prevent forum shopping by returning the child to his or her home jurisdiction so that a custody determination can be made in the proper forum. To that end, courts outside the child's original home country are precluded from considering the merits of the underlying custody dispute.

5. Mr. Watt and Respondent have a ten-year-old daughter together, A.W. (the "Child").[1]

6. Since May 2023, Respondent has continually withheld A.W. from Mr. Watt in violation of his custody rights, including doing so in violation of active Jamaican court orders for at least twenty (20) months in 2023-25.

7. In July 2023, without Mr. Watt's consent, Respondent unlawfully removed A.W. from her home country in Jamaica to the United States in violation of Mr. Watt's custody rights and a valid Jamaican court order. She has likewise wrongfully retained A.W. in the United States without Mr. Watt's permission.

8. Beginning in May 2023, several weeks before Respondent unilaterally removed A.W. to the United States, and continuing to the filing of this Complaint, Respondent has not

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), only the initials of the minor Child are provided. To the same end, redactions have made to supporting exhibits as necessary to conceal the minor Child's full name. The undersigned will provide the full name of the Child in a sealed filing. In the same sealed filing, the undersigned will provide the current residential address for Respondent and the Child for the purposes of establishing jurisdiction and effectuating service as requested in Petitioner's prayer.

allowed Mr. Watt to have any communication—either directly or indirectly—with his daughter, nor has she directly communicated with Mr. Watt in any way. In fact, since May 2023, Respondent has worked to actively conceal A.W. from Mr. Watt. Thus, due solely to Respondent's actions, Mr. Watt has had no ability to see or speak with his daughter for over a year and a half.

9. Notwithstanding Respondent's wrongful conduct, from the moment Respondent began wrongfully withholding A.W.—first in Jamacia and now in the United States—to the present, Mr. Watt has never ceased trying to reunite with his daughter.

10. In September 2023, Mr. Watt found a lead. Mr. Watt learned that Respondent had taken A.W. to the United States. Mr. Watt did not learn exactly where the Respondent had gone, only that Respondent had fled to the United States.

11. In December 2023, Mr. Watt traveled to the United States to look for A.W. Based on his belief that she was in New York, he began his search there. While in New York, he went to two courts and the Jamaican consulate, but each entity that he spoke with informed him that the recovery of his daughter was outside their jurisdiction.

12. Mr. Watt returned to Jamacia in January 2024 and returned once again to the Jamaican court that had adjudicated his previous custody disputed with Respondent, seeking some relief or assistance in finding his daughter. The Jamaican court informed him that he should go to the Jamaica Central Authority, which is Jamaica's Child Protection and Family Services Agency. Mr. Watt then went to the Jamaica Central Authority, which informed him of the Hague Convention process.

13. Mr. Watt subsequently filed a Hague Convention application with the Jamaican Department of State, which subsequently led to the filing of this action.

14. A.W. is currently located at an address that falls within the jurisdiction of the Western District of North Carolina.

15. Through this action, Mr. Watt seeks to secure A.W.'s return to Jamacia as required by the Hague Convention and ICARA.

## II. JURISDICTION AND VENUE

15. Mr. Watt is a citizen and resident of Jamacia.

16. Respondent is a citizen of Jamacia, who, on information and belief, now resides with the Child in Gaston County, within the jurisdiction of the Western District of North Carolina.

17. This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

18. Venue is proper pursuant to 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b) because A.W. is currently located in Gaston County, in the jurisdiction of the Western District of North Carolina.

## III. STATEMENT OF FACTS

19. A.W. was born in Kingston, Jamacia in late 2014.

20. A.W.'s birth certificate records Kingston as her place of birth.[2]

21. In 2014, a Jamaican court-ordered paternity test determined that Mr. Watt is A.W.'s father.

22. Prior to Respondent removing A.W. from Jamacia, A.W. had never set foot outside Jamaica.

23. Mr. Watt and Respondent were never in a formal relationship.

---

[2] A redacted copy of A.W.'s birth certificate is attached hereto as Exhibit A.

24. When A.W. was born, she lived with Respondent. Since obtaining a paternity test shortly after her birth—which confirmed that Mr. Watt is A.W.'s father—Mr. Watt has continually tried to co-parent with Respondent. Despite these efforts, Respondent has continually prevented Mr. Watt from having access to his child. Respondent has tried for large parts of A.W.'s life to restrict Mr. Watt's access to his daughter.

25. For example, Respondent did not allow Mr. Watt to see A.W. for the first time until she was two weeks old. For the next two years, Respondent rarely allowed Mr. Watt to see his daughter—although he took every opportunity afforded him to spend time with her.

26. From the time that A.W. was two years old until she was four-years old, Respondent prevented Mr. Watt from seeing his daughter entirely. During that time period, Mr. Watt would travel to Respondent's home, church, and A.W.'s school in an attempt to see A.W. The only time Mr. Watt was able to see his daughter was by visiting A.W.'s school. The school permitted Mr. Watt to see A.W. because he was her father. When visiting Respondent's home, Respondent never answered the door—although Mr. Watt occasionally spoke with Respondent's mother, who always informed him that Respondent was not home.

27. Faced with no other option if he wanted to see his daughter on a consistent basis, Mr. Watt filed for custody in family court in Jamaica in late 2021. Through the subsequent proceedings, that court affirmed his parental rights on January 11, 2022.[3] Among other things, the Jamaican court ordered that Mr. Watt have visitation on alternate weekends and that neither party was permitted to leave the jurisdiction of the Jamaican court without the written consent of the other party. Thus, under the terms of the Jamaican court order, Respondent was prohibited from taking A.W. out of the Jamaican court's jurisdiction without Mr. Watt's consent.

---

[3] The January 11, 2022 Jamaican court order is attached at Exhibit B.

28. Even after Mr. Watt received a Jamaican court order affirming his parental rights, Respondent continued to attempt to deny him access to A.W. For instance, the Jamaican court order granted Mr. Watt visitation rights, including the ability to pick up A.W. from school for weekends. On days when Mr. Watt was scheduled to pick up A.W from school, Respondent would frequently not send A.W. to school at all.

29. In the face of Respondent's efforts to withhold A.W. from him, Mr. Watt continued to seek to exercise his parental rights. Mr. Watt provided financial assistance through the court-administered system. He also moved homes to be closer to A.W.

30. Despite these efforts, Respondent continued to withhold A.W. from Mr. Watt. Mr. Watt returned to the Jamaican court four times during the next sixteen (16) months to seek increasingly specific instructions from the court in order to thwart Respondents attempts to deny his right to visitation, culminating in a May 5, 2023 court order specifying the exact time and place that Mr. Watt was to pick up his daughter on Fridays.[4]

31. Later in May 2023, Respondent resorted to more drastic measures to withhold A.W. from Mr. Watt. When Mr. Watt went to pick up A.W. from school, she once again was not there. This time, Respondent had removed A.W. from school and taken her to an undisclosed location. Mr. Watt did not know that Respondent was going to take A.W., and Mr. Watt believed that A.W. would be at school when he went to pick her up. Although Mr. Watt did not know it at the time, he would not see his daughter again for nearly two years.

32. After understanding that Respondent had taken A.W., Mr. Watt began to search for her. Mr. Watt went to the Jamaican police, who went to Respondent's house and Respondent's place of work several times, searching for her and A.W.

---

[4] The May 5, 2023 Jamaican court order is attached as Exhibit C.

33. Mr. Watt also returned to Jamaican family court seeking to enforce the custody agreement. When Respondent failed to appear, the Jamaican court issued a warrant for Respondent's arrest.

34. The Jamaican court ultimately referred him to the Jamaican Immigration and Citizenship Agency ("JICA"), who informed Mr. Watt that Respondent had taken A.W. out of the country. The JICA did not have any information as to where Respondent brought A.W.

35. Respondent's taking of A.W. out of the country was in violation of the prior court order, which required Mr. Watt's approval before A.W. could leave the country.

**A.  A.W.'s Country of Habitual Residence is Jamacia.**

36. A.W. was born in Jamacia.

37. After her birth, A.W. lived in Jamacia until the time of her wrongful removal to and retention in the United States by Respondent.

38. Prior to the wrongful removal to and retention in the United States, A.W. had never left Jamacia. A.W.'s entire community, including her school, church, and home were in Jamaica.

39. Thus, there is no question that, prior to A.W.'s wrongful removal to and retention in the United States, Jamaica was her habitual country of residence.

**B.  Mr. Watt Has Custody Rights Under Jamaican Law.**

    **a.  *Mr. Watt has custody rights under Jamaican law.*[5]**

40. Under the laws of Jamaica, both father and mother have parental authority over a minor. Jamaican law also specifies that parents and legal guardians are presumed to have custody

---

[5] To determine whether a party has "rights of custody" "courts have repeatedly assumed rights of custody for purposes of Article 3 of the Convention means rights of custody at the time of removal." *White v. White*, 718 F.3d 300, 307 (4th Cir. 2013). Here, Mr. Watt had rights of custody at the time of removal under the laws of the country of habitual residence, Jamaica.

rights over a child. *See* Jamaican Child Care and Protection Act § 2(4)(a) ("any person who is the parent or legal guardian of a child, or who is legally liable to maintain the child, shall be presumed to have the custody of the child, and as between father and mother, neither shall be deemed to have ceased to have such custody by reason only that the father or mother has deserted, or otherwise does not reside with, the other parent and the child . . . .").[6]

41. Courts in the 4th Circuit have recognized that, unless adjusted by a court, an individual possessing parental authority will also have custody rights. *See Chambers v. Russell*, No. 1:20CV498, 2020 U.S. Dist. LEXIS 154919, at *20 (M.D.N.C. Aug. 26, 2020) (noting that, under Jamaican law, "any person who is the parent or legal guardian of a child, or who is legally liable to maintain the child, shall be presumed to have the custody of the child").

42. In the absence of any court order removing or limiting Mr. Watt's parental authority, he has custody rights arising as a matter of Jamaican law.

### b. *The Jamaican judiciary has affirmed Mr. Watt's custody rights in court orders.*

43. Not only is there no court order limiting Mr. Watt's custody rights arising naturally as a matter of Jamaican law, but Jamaican courts have in fact repeatedly and explicitly affirmed Mr. Watt's rights of custody over A.W.

44. Due to Respondent's repeated withholding of A.W. from Mr. Watt, Mr. Watt sought a court order to affirm his rights. On January 11, 2022, a Jamaican court issued an order granting Mr. Watt custody of A.W. on alternate weekends as well as custody during parts of holidays and other access rights.[7] The Court order also required that "[n]o one parent is to leave the jurisdiction with the child without the written consent of the other party. Such consent is not

---

[6] The Children (Guardianship and Custody) Act, is attached as Exhibit D.

[7] The January 11, 2022 Jamaican court order is attached as Exhibit B.

8

Case 3:25-cv-00181-KDB-DCK   Document 1   Filed 03/13/25   Page 8 of 17

to be unreasonably denied. Date of travel, location of travel, overseas contact information of child is to be communicated to the non-traveling parent, at least one (1) week before the time of travel."

45. In separate court orders dated March 8, 2022, and May 16, 2022, a Jamaican court reaffirmed those requirements.[8]

46. Respondent, however, continued to not comply, and Mr. Watt was forced to return to the Jamaican court seeking to reinforce those orders. As a result, the Jamaican court issued a subsequent order on May 5, 2023, specifying the exact time and place that Mr. Watt was to pick A.W. up from school on Fridays.[9]

47. But rather than follow those court orders, in mid-May 2023, Respondent removed A.W. from school and absconded to a separate part of Jamaica. Mr. Watt returned to the Jamaican court, which issued the order stating "Take notice, that unless you obey the directions contained in this order, you will be liable to be committed to prison. Dated this 8th day of June, 2023."

48. As a result of the litigation in, and orders issued by Jamaican courts, Mr. Watt has rights of custody in addition to those arising as a matter of Jamaican law.

C.  **Mr. Watt Was Exercising His Rights of Custody at the Time of the Wrongful Removal and Retention and Would Have Continued to Exercise Custody but For the Wrongful Removal and Retention.**

49. At all times, since A.W. was born, Mr. Watt has exercised his rights of custody.

50. Prior to Respondent's wrongful withholding of A.W. in Jamacia, Mr. Watt provided for A.W. both financially and emotionally.

---

[8] The March 8, 2022 Jamaican court order is attached as Exhibit E. The May 16, 2022 Jamaican court order is attached as Exhibit F.

[9] *See* Exhibit C ("On the 5th May, 2023: Final variation order made on the 16th May, 2022 is now varied as a final order to read: by consent, it is hereby ordered that the Applicant/father, Chest Watt is to collect the child at school no later than 2:15pm. Thereafter, father's access is subject to mother's discretion. Effective on the 5th May, 2023.").

9

51. From the time Respondent first began withholding A.W. from her father, to present, Mr. Watt has never stopped trying to reunite with his daughter, and he has used every resource available to him to locate and contact his daughter.

52. Moreover, even before Respondent began withholding A.W. in Jamacia, Mr. Watt exercised his rights of custody by actively participating in judicial proceedings clarity on custody determinations.

53. As explained above, Mr. Watt filed a court case in late 2021 seeking to enforce his custody rights as A.W.'s father, which resulted in a judgement confirming those rights on January 11, 2022.[10] Thereafter, Mr. Watt returned to court four times over the next sixteen (16) months seeking to enforce those rights and the visitation he had been granted by the court in the face of Respondent's non-compliance.

54. In spite of those Jamaican court orders, Respondent fled Jamacia and withheld A.W. from Mr. Watt. First, in the weeks following the May 5, 2023 court order, Respondent removed A.W. from school when Mr. Watt was supposed to pick her up. Mr. Watt searched for Respondent and A.W. but could not find them.

55. Mr. Watt searched for his daughter for months, including going back to the Jamaican courts seeking assistance on finding his daughter. The Jamaican court pointed Mr. Watt to the Jamaican Immigration and Citizenship Agency, which eventually informed him that Respondent and A.W. had left the country in July 2023.

56. Mr. Watt then learned that Respondent and A.W. had gone to the United States. Seeking his daughter, Mr. Watt traveled to the United States in December 2023, looking for his daughter for weeks, but he was unable to find her.

---

[10] *See* Ex. B.

10

Case 3:25-cv-00181-KDB-DCK   Document 1   Filed 03/13/25   Page 10 of 17

57. Mr. Watt returned to Jamacia and went back to Jamaican courts, seeking a way to find his daughter. The Jamaican courts directed Mr. Watt to the Hague Convention process. Mr. Watt filled out an application and submitted it on September 22, 2024. In November, the United States Department of State provided Mr. Watt with a list of attorneys who he could contact to obtain assistance with his case. Initially, Mr. Watt contacted attorneys on the list provided to him by the Department of State, but was unable to engage an attorney because he did not know where in the U.S. Respondent had taken A.W., and thus has no prospect of being able to locate her for service. Subsequently, on January 7, 2025, the State Department provided information on A.W.'s current location, at which time Mr. Watt restarted the process of attempting to engage counsel to begin the process of filing the Complaint.

58. As demonstrated by Mr. Watt's never-ending commitment to locating his daughter, whether in Jamacia or the United States, and as evidenced by the filing of this suit, Mr. Watt has never failed to exercise his custody rights. *See Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (explaining that "a person who has valid custody rights to a child under the law of the country of the child's habitual residence cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." (cleaned up)).

59. Therefore, Mr. Watt was and still is exercising custody under the Hague convention.

**D.    Respondent's Wrongful Removal and Retention of A.W. in the United States Violates Mr. Watt's Rights of Custody Under Jamaican law.**

60. As demonstrated above, Mr. Watt has rights of custody under Jamaican law – the location of A.W.'s habitual residence prior to her wrongful removal to the United States – and was

exercising those rights. Thus, when Respondent first wrongfully removed and retained A.W. in the United States, she did so in violation of Mr. Watt's custody rights.

61. Respondent absconded with A.W. to the United States in violation of the 2022 and 2023 Jamaican Court orders directing that she should not remove the A.W. from Jamaica without the authorization of Mr. Watt (which he never provided).

62. Thus, Respondent's unilateral decision to remove A.W. from Jamacia and retain her in the United States, without Mr. Watt's consent, is in violation of Mr. Watt's custody rights. *See* Hague Convention, Art. 5(a) (defining "rights of custody" under Article 3 to include "in particular, the right to determine the child's place of residence").

## IV. CAUSES OF ACTION

### A. Count One – Claim for Relief Under the Hague Convention

63. Mr. Watt incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further alleges the following:

64. The Hague Convention and ICARA apply in this case because A.W. is less than sixteen-years old and the United States and Jamacia are both "Contracting States" under the Hague Convention. Hague Convention, arts. 1, 4.

65. The Hague Convention and ICARA require the return of children wrongfully removed to or retained in the United States to their home country. *See id.*, art. 12.

66. The removal or retention of a child is wrongful when (a) it is in breach of the left-behind parent's rights of custody in the country where the child was habitually resident before removal and (b), at the time of the removal or retention, the left-behind parent was actually exercising those rights, either jointly or alone, or would have exercised those rights but for the removal or retention. *Id.*, art. 3.

67. Rights of custody may arise by operation of law or by reason of a judicial or administrative decision. *Id.* Rights of custody include rights relating to the care of the child and, in particular, the right to determine the child's place of residence. *Id.*, art. 5(a).

68. As shown above, A.W. was a habitual resident of Jamacia prior to her wrongful removal from Jamacia and retention in the United States; thus, Jamaican law governs Mr. Watt's rights of custody.

69. As shown above, Mr. Watt had rights of custody by operation of Jamaican law and by operation of Jamaican Court orders.

70. As shown above, Mr. Watt was exercising his rights of custody prior to Respondent's wrongful retention of A.W. in the United States and would have continued exercising those rights but for Respondent's wrongful removal and retention of A.W.

71. The Hague Convention and ICARA therefore require that A.W. be returned to Jamacia so that a Jamaican court can make a custody determination.

B. **Count Two – Attorneys' Fees and Costs.**

72. Mr. Watt incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further alleges the following:

73. Pursuant to 22 U.S.C. § 9007, Mr. Watt respectfully requests that this Court award him all necessary expenses incurred by or on behalf of Mr. Watt, including court costs, legal fees, or other care during the course of proceedings in the action, and transportation costs related to the return of A.W.

V. **NOTICE OF HEARING**

75. Mr. Watt incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further alleges the following:

76. Pursuant to 22 U.S.C. § 9003(c), Respondent shall be given notice of this Petition in accordance with North Carolina General Statute §50A-108 and §50A-205 of the UCCJEA.

## VI. RELIEF REQUESTED

**WHEREFORE**, Petitioner Chester D. Watt prays for the following relief:

a) An immediate *ex parte* temporary restraining order ("TRO") (i) prohibiting Respondent (and anyone acting in concert with her or on her behalf) from removing A.W. from the jurisdiction of this Court pending a hearing on the merits of this Verified Complaint; (ii) ordering Respondent to surrender her and A.W.'s passports, visas, or other travel documentation to the Court for the duration of these proceedings; (iii) ordering Respondent to provide the Court and Mr. Watt with current contact information for herself and A.W.; (iv) ordering Respondent to disclose her and A.W.'s current location to Mr. Watt, through counsel, at least once every twenty-four hours until the Court rules on the merits of the Verified Complaint and ordering Respondent to advise the Court and Mr. Watt, through his counsel, in writing any time Respondent or A.W. will be gone from their current address for more than twenty-four hours; (v) ordering that Respondent ensure that A.W. communicates with Mr. Watt via telephone or similar video technology at least once every twenty-four hours until the Court rules on the merits of the Verified Complaint; (vi) ordering Respondent to permit Mr. Watt in-person visitation with A.W. if Mr. Watt travels to the United States from the time of the order until the Court rules on the merits of the Verified Complaint; and (vii) directing the United States Marshals Service to serve Respondent with a copy of this Complaint and the TRO, and to take possession of A.W.'s passports, visas, or other travel documentation, if available, at the time of service;[11]

b) The scheduling of an expedited and combined preliminary injunction and hearing on the merits of this Verified Complaint;

c) Pursuant to Federal Rules of Civil Procedure 40 and 65, 22 U.S.C. § 9003(d), and Article 2 of the Hague Convention (requesting that signatories to the Convention "use the most expeditious procedures available"), an order that the trial of the action on the merits be advanced and consolidated with the hearing on the preliminary injunction;

d) An order that Respondent show cause at this hearing why A.W. should not be returned to Jamacia, and why such other relief requested in this Petition should not be granted;

e) A final judgment ordering that A.W. be returned to Jamacia, where—consistent with the Hague Convention—an appropriate custody determination can be made by a Jamacia court under Jamaican law;

---

[11] The grounds for items (a)–(c) are set forth in Mr. Guardian's concurrently filed Application for *Ex Parte* Temporary Restraining Order and Scheduling of Expedited Preliminary Injunction Hearing. Respondent's service address and the Child's full name will be provided in a sealed filing as necessary to effectuate item (a)(vii).

f) An order requiring that Respondent pay Petitioner's expenses, including court costs, legal fees, or other care during the course of proceedings in the action, and transportation costs related to the return of A.W.;

g) An order that Respondent sign all necessary forms and make necessary arrangements to allow A.W. to return to Mr. Watt; and

h) Any such further relief as may be just and appropriate under the circumstances of this case.

Dated: March 13, 2025                                Respectfully Submitted,

/s/ *Megan Coates Byrd*
Megan Coates Byrd (lead counsel)
State Bar No. 59603
**ALSTON & BIRD LLP**
555 Fayetteville Street #600
Raleigh, NC 27601
919-862-2200 – Telephone
919-862-2260– Facsimile

Mia L. Falzarano (*Pro Hac Vice* Forthcoming)
Mia.Falzarano@alston.com
**ALSTON & BIRD LLP**
2200 Ross Avenue, Ste. 2300
Dallas, TX 75201
(214) 922-3400 – Telephone
(214) 922-3899 – Facsimile

Stephen Simrill (*Pro Hac Vice* Forthcoming)
Sarah J. Lee (*Pro Hac Vice* Forthcoming)
Colton Jackson (*Pro Hac Vice* Forthcoming)
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004-1404
202-239-3300– Telephone
202-239-3333– Facsimile

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare that I have read the foregoing VERIFIED COMPLAINT AND PETITION FOR RETURN OF CHILD. I declare under penalty of perjury under the laws of the United States that the factual allegations in the foregoing are true and correct.

Executed this 11 day of March 2025.

/s/ *Chester D. Watt*
Chester D. Watt